Douglas B. Thayer (Bar No. 8109)
Andy V. Wright (Bar No. 11071)
Cole L. Bingham (Bar No. 14131)
DURHAM JONES & PINEGAR, P.C.
3301 N. Thanksgiving Way, Suite 400
Lehi, Utah 84043
Telephone: (801) 375-6600
Facsimile: (801) 375.3865
Email: dthayer@djplaw.com
        awright@djplaw.com
        cbingham@djplaw.com

David Quinto (Bar No. 106232)
VIDANGEL, Inc.
3007 Franklin Canyon Dr.
Beverly Hills, CA 90210-1633
Telephone:  (213) 604-1777
Email:  dquinto@VidAngel.com
(pro hac vice pending)

Ryan G. Baker (Bar No. 214036)
Jaime Marquart (Bar No. 200344)
Scott M. Malzahn (Bar No. 229204)
Brian T. Grace (Bar No. 307826)
BAKER MARQUART LLP
2029 Century Park East, Sixteenth Fl.
Los Angeles, California 90067
Telephone:  (424) 652-7800
Facsimile:  (424) 652-7850
Email:  rbaker@bakermarquart.com (pro hac vice pending)
        jmarquart@bakermarquart.com (pro hac vice pending)
        smalzahn@bakermarquart.com (pro hac vice pending)
        bgrace@bakermarquart.com (pro hac vice pending)

*Attorneys for Plaintiff VidAngel, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| VIDANGEL, INC., a Delaware corporation,<br><br>    Plaintiff,<br><br>vs.<br><br>SULLIVAN ENTERTAINMENT GROUP INC., also known as Sullivan Entertainment Inc. and Sullivan Entertainment, a Canadian corporation; MARVEL CHARACTERS, INC., a Delaware corporation; MVL FILM FINANCE, LLC, a Delaware limited liability | **COMPLAINT**<br><br>**(Jury Demand)**<br><br>Case No.  2:17cv00989 EJF<br><br>Magistrate Evelyn J. Furse |

company; TWENTIETH CENTURY FOX
HOME ENTERTAINMENT, LLC, a Delaware
limited liability company; FOX DIGITAL
ENTERTAINMENT, INC., a Delaware
corporation; FOX BROADCASTING
COMPANY, INC., a Delaware corporation;
NEW WORLD PICTURES, LTD., a Delaware
company; CASTLE ROCK
ENTERTAINMENT, INC.; a Georgia
corporation; TURNER ENTERTAINMENT
CO., a Delaware company; VILLAGE
ROADSHOW PICTURES ENTERTAINMENT
INC., a Delaware corporation; REGENCY
ENTERTAINMENT (USA), INC., a California
corporation; METRO-GOLDWYN-MAYER
STUDIOS, INC., a Delaware corporation,

       Defendants.

Plaintiff VidAngel, Inc., by and through counsel, complains against Defendants Sullivan

Entertainment Group Inc. (also known as Sullivan Entertainment Inc. and Sullivan

Entertainment), Marvel Characters, Inc., MVL Film Finance, LLC, Twentieth Century Fox

Home Entertainment, LLC, Fox Digital Entertainment, Inc., New World Pictures, Ltd., Castle

Rock Entertainment, Inc., Turner Entertainment Co., Village Roadshow Pictures Entertainment

Inc., Regency Entertainment (USA), Inc. and Metro-Goldwyn-Mayer Studios, Inc. (collectively,

"Defendants"), and for its causes of action alleges as follows:

## PARTIES, JURISDICTION, AND VENUE

1.     Plaintiff VidAngel, Inc. ("VidAngel") is a corporation duly incorporated under

the laws of the State of Delaware with its principal place of business in Provo, Utah.  VidAngel

is the leading entertainment platform empowering users to filter movies and television shows as

expressly authorized by Congress.  Using VidAngel's proprietary technologies, consumers can

view content in a customized experience that offers the greatest degree of personal choice in the entertainment marketplace – all as expressly authorized by Congress in the Family Home Movie Act of 2005, as explained more fully below.

2.     Defendant Sullivan Entertainment Group Inc., also known as Sullivan Entertainment Inc. and Sullivan Entertainment ("Sullivan"), is a Canadian corporation with its principal place of business in Toronto, Canada.  Sullivan is a motion picture and television production company whose works have been broadcast in the United States by CBS, PBS, Disney, and Lifetime, among others.  Sullivan regularly transacts business in the United States as reflected by the fact that it owns multiple active trademarks registered on the Principal Register of the United States Patent and Trademark Office and owns numerous other pending U.S. trademark applications.

3.     Defendant Marvel Characters, Inc. is a Delaware corporation with its principal place of business in California.

4.     Defendant MVL Film Finance, LLC is a limited liability company formed in Delaware with its principal place of business in California.

5.     Defendant Twentieth Century Fox Home Entertainment, LLC is a limited liability company formed in Delaware with its principal place of business in California.

6.     Defendant Fox Digital Entertainment, Inc. is a Delaware corporation with its principal place of business in California.

7.     Defendant Fox Broadcasting Company, Inc. is a Delaware corporation with its principal place of business in California.

8.     Defendant New World Pictures, Ltd. is a Delaware company with its principal place of business in California.

9.     Defendant Castle Rock Entertainment, Inc. is a Georgia corporation with its principal place of business in California.

10.     Defendant Turner Entertainment Co. is a Delaware corporation with its principal place of business in California.

11.     Defendant Village Roadshow Pictures Entertainment Inc. is a Delaware corporation with its principal place of business in California.

12.     Defendant Regency Entertainment (USA), Inc. is a California corporation with its principal place of business in California.

13.     Defendant Metro-Goldwyn-Mayer Studios, Inc. is a Delaware corporation with its principal place of business in California.

14.     This Court has original and exclusive subject matter jurisdiction over this copyright action pursuant to 28 U.S.C. §§ 1331, 1338, and 2201.

15.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (d).

## STATEMENT OF THE CASE

16.     VidAngel provides a service that allows families to filter the content of motion pictures, including certain television programs, to their individual specifications and have the filtered content streamed to them for private family viewing.  Beginning in 2015, that service has operated in two ways and can be operated in a third way.  First, beginning in 2015 and ending December 29, 2016, VidAngel purchased DVD and Blu-ray copies of motion pictures, decrypted them to allow their content to be "tagged" for numerous types of verbal and graphic content that

viewers might find objectionable, stored multiple copies of each motion picture in the cloud in encrypted "bits," and then streamed the content of the motion pictures, filtered as requested, to individual consumers who first purchased an authorized DVD or Blu-ray copy of that motion picture from VidAngel.  During that time period, almost 90 percent of filtering of popular movies and TV shows on the VidAngel platform was using modern streaming devices such as Apple TV, Amazon Fire TV, iPad, iPhone, and others (VidAngel was and still is the only option to do so).

17.     Beginning June 13, 2017, VidAngel has offered a new method to provide filtered motion picture content to families.  VidAngel now subscribes to a licensed streaming service ("LSS"), pays for and captures a stream of each motion picture the LSS offers to its customers, "tags" the captured stream for objectionable content, and stores the captured stream duplicated at each of eight bit rates in encrypted bits stored in the cloud.  Rather than purchase a DVD or Blu-ray copy of a motion picture from VidAngel, a VidAngel customer must now subscribe to an LSS (currently Netflix or Amazon) and must have an authorized stream of the motion picture he or she wishes to watch transmitted to VidAngel.  VidAngel simultaneously streams the appropriate bits at the most appropriate bit rate to the consumer for private viewing.

18.     VidAngel also possesses the necessary technology and has demonstrated its ability to provide the 2015-16 service without decrypting discs.  Instead, it plays the content of a DVD or Blu-ray disc using a DVD player, as any consumer would do when watching a DVD at home.  As the content is played, VidAngel captures the signal that would otherwise be transmitted to a television set and tags its contents in the same manner as VidAngel has practiced

since June 13, 2017.  Using this process, VidAngel is not required to, and does not, decrypt any DVD or Blu-ray disc.

19.     VidAngel has compensated motion picture copyright owners for their content through different means.  Under the 2015-16 service, motion picture copyright holders were compensated for the use of their works through the sale of DVDs at the times and for prices they set.  Under VidAngel's current service, motion picture copyright holders are compensated for the use of their works through the fees they charge LSSs whenever a consumer purchases the right to view a motion picture from an LSS.

20.     Sullivan is the copyright owner of various motion pictures, including several that VidAngel made available to its customers during 2015-16.  VidAngel purchased 375 copies of Sullivan's titles, of which 211 are now owned by its customers, having been streamed to them for private viewing.

21.     By e-mail message sent August 14, 2017, Sullivan's president, Kevin R. Sullivan, accused VidAngel of "illegally streaming Sullivan Content" and demanded that VidAngel "cease and desist in any future attempt to stream our content."  The e-mail message, a true and correct copy of which is attached as Exhibit A, was copied to Sullivan's outside legal counsel at the Lenczner Slaght law firm, whose website boasts on its home page: "We're expert litigators."

22.     A dispute has arisen between VidAngel and the remaining non-Sullivan defendants.  Metro-Goldwyn-Mayer Studios, Inc. has requested that VidAngel stop streaming its copyrighted works.  Additionally, counsel for VidAngel has engaged in written and telephonic communications with attorneys who represent the interests of MVL Film Finance, LLC, Turner

Entertainment Co. and the other remaining defendants.  Like Sullivan, the remaining defendants

have taken the position that VidAngel's streaming of their copyrighted works is unlawful.

23.     An actual dispute now exists between the parties concerning whether VidAngel's

2015-16 and current services are lawful.  Accordingly, VidAngel seeks a declaration as to each

service that it is lawful pursuant to either or both the Family Movie Act of 2005, codified in

principal part at 17 U.S.C. § 110(11), or the copyright "fair use" doctrine (17 U.S.C. § 107).

## GENERAL ALLEGATIONS

### The Family Movie Act of 2005

24.     Many parents struggle to find ways to shield their children and others within their

homes from viewing or listening to violence, sex, profanity and other content they find

objectionable in television programs and motion pictures.  There is great demand for services

that allow them to filter out these objectionable elements.  A survey conducted for VidAngel

found that approximately 47% of parents want online filtering services.  Unsurprisingly, many

are not sufficiently technology-savvy to filter content on their own; instead, they must and do

rely on third-party services, including but not limited to VidAngel.

25.     In response to the demand from parents and other consumers to control the

content they view in the privacy of their homes, Congress enacted the FMA, which specifically

provides that it is ***not*** a violation of copyright to create or provide a "computer program or other

technology that enables" filtering "by or at the direction of a member of a private household, of

limited portions of audio or video content of a motion picture, during a performance in or

transmitted to that household for private home viewing, from an authorized copy of the motion

picture."  17 U.S.C. § 110(11).  As used in the FMA, "motion picture" is defined to include

television programs.  *Id.*  The FMA immunized from copyright infringement and expressly

authorizes: (1) a third party to create a computer program or other technology; (2) that enables a

member of a private household to make imperceptible limited portions of an authorized copy of a

motion picture's audio or video content; (3) to transmit that technology or computer program to a

household at the direction of a member of a private household; and (4) if no fixed copy of the

altered version is created.  The FMA provides in critical part as follows:

> Notwithstanding the provisions of section 106, the following are not infringements of
> copyright:
>
> · · ·
>
> **(11)**  the making imperceptible, by or at the direction of a member of a private
> household, of limited portions of audio or video content of a motion picture, during a
> performance in or transmitted to that household for private home viewing, from an
> authorized copy of the motion picture, or the creation or provision of a computer program
> or other technology that enables such making imperceptible and that is designed and
> marketed to be used, at the direction of a member of a private household, for such making
> imperceptible, if no fixed copy of the altered version of the motion picture is created by
> such computer program or other technology.  *Id.*

26.     The FMA expressly does not require that the household or the technology

provider operating at the direction of the household obtain the consent of the copyright holder

prior to filtering a work, provided that no fixed copy of the altered work is created. 17 U.S.C. §

110(11).  This lack of a consent requirement for filtering is essential to any functioning market

for filtering motion pictures because the major studios that own those works and the directors

that create them were (and remain) vehemently opposed to the enactment of the FMA and to

companies that provided filtering technology.

27.     The legislative history of the FMA describes the origin of the FMA as follows:

The Committee strongly believes that, subject to certain conditions, copyright and trademark law should not be used to limit a parent's right to control what their children watch in the privacy of their own home. A dispute involving this issue is currently being heard in the U.S. District Court for the District of Colorado [*Huntsman*, 180 F.3d 1072 (9th Cir.)]. Testimony provided by the Register [of Copyright] on June 17, 2004, makes clear that some parties to the suit should not face liability for their current actions, while others appear to be in violation of existing copyright law. The "Family Movie Act" clarifies the liability, if any, for the companies that are a party to this case and to other companies not a party to this case that may be interested in providing such services in the future.

H.R. Rep. 109-33 at 5.

28.     The FMA does not dictate what type of content families may make imperceptible. The FMA was "drafted in a content-neutral manner so that its operation and impact do not depend upon whether the content . . . made imperceptible contains items that are often viewed as offensive, such as profanity, violence, or sexual acts. . . .The goal of the legislation [is] to give the viewer the ability to make imperceptible limited portions of [a] work that he or she chooses not to see for themselves or their family, whether or not the skipped content is viewed as objectionable by most, many, few, or even one viewer." *Id.* at 224. Were the FMA not content-neutral, it would fail First Amendment scrutiny.

29.     In drafting the FMA, Congress specifically considered whether the public would benefit from having for-profit companies offer such filtering services. Following subcommittee hearings, the House Copyright Committee (the "Committee") concluded that:

The for-profit nature of the entities providing services to the public that the legislation addresses has no bearing on the operation of the immunity from liability. The Committee is unable to discern a credible basis for creating a distinction between the for-profit or non-profit nature of companies that offer services covered by the Act.

*Id.* at 225.  Thus, Congress understood that the content filtering permitted by the FMA would likely be provided by for-profit companies.

30.     Likewise, federal courts have recognized that the FMA protects filtering services from the studios' infringement claims: "the effect of the Family Movie Act is that Congress made a policy decision that those who provide the technology to enable viewers to edit films for their private viewing should not be liable to the copyright owners for infringing their copyright . . . ."  *Huntsman v. Soderbergh*, No. Civ. A02CV01662RPMMJW, 2005 WL 1993421 (D. Colo. 2005).

31.     During congressional deliberations over the FMA, the House Copyright Committee acknowledged that it was "aware of concerns regarding the legislation's impact upon moral rights, particularly those of movie directors."  While preserving the directors' right to control the editing of content in the public sphere, the Committee granted individual viewers the right to filter content for viewing within the privacy of their homes, with the assistance of remote technology offered by for-profit companies.  It wrote:

> The Committee had hoped to receive testimony from a representative of the director's community on this issue [of moral rights] at one of the Committee hearings on the issue, but no director was willing to testify.  The Committee is aware of numerous motion pictures being edited for screen size, content, and time purposes with or without the director's consent so that a motion picture can be displayed on the 4-3 aspect ratios of standard definition televisions, on an airplane with objectionable language removed, and on television channels in the traditional 90 or 120 minute time slots. The Committee sees no difference between the impact upon the moral rights of directors of such modifications and someone wanting to prevent certain content from being displayed on their television.

H.R. Rep. 109-33 at 225.  Thus, Congress fairly protected the directors and studios from the threat of public censorship, while simultaneously granting individuals the right to customize content in a private setting.

32.     The Committee weighed the studios' objection to filtering content and determined that neither copyright nor trademark law should be used to limit a parent's right to control what his or her family watches in private.  Accordingly, for-profit companies and private individuals have the right to filter motion pictures in accordance with the FMA.

33.     When the FMA was enacted in 2005, physical media was king in the home entertainment world.  DVDs were by far the most popular video format for Americans.  According to the Digital Entertainment Group (the "DEG"), in 2006 Americans spent $22.8 billion on DVD sales and rentals, representing 99% of home entertainment spending.  *DEG Year-End 2006 Home Entertainment Sales Update*, The Digital Entm't Grp. (Jan. 8, 2007), http://degonline.org/wp-content/uploads/2014/02/f_4Q06.pdf.  At that time, most households had DVD players and almost every desktop or laptop computer had a DVD drive.

34.     Today, the home entertainment landscape is dramatically different.  Sales of DVDs and Blu-ray discs have steadily declined in recent years.  In 2014, the DEG reported that for the first time, Americans spent more on digital video providers than physical discs.

35.     Americans are also using new methods to view video content, as consumers shift from physical discs to digital content that may be viewed on a number of different devices.  In 2016, the Pew Research Center reported that 77% of American adults owned smartphones and 51% owned tablet computers.  Unsurprisingly, it has become increasingly difficult to purchase laptops with DVD drives, as consumers demand lightweight portable devices and as digital delivery of content becomes more feasible and prevalent.

36.     As a result, there is a nationwide demand for online filtering services that transmit filtered content over the Internet, at the direction of heads of household, to personal computers

and other devices, including mobile applications, smart phones and remote streaming devices (in fact, VidAngel found that almost 90 percent of filtering occurred on modern streaming devices rather than personal computers).  The market for filtered movies is, according to National Research Group, 40 percent of Americans.  Improvements in Internet access and speed have enabled viewers to unplug and rely heavily on streaming as a main source of video consumption.  From 2010 to 2016, the increasing prevalence of smartphones, tablets and other Internet-connected devices has mirrored and largely been driven by the increased effectiveness and reliability of streaming video.  Many Americans rely upon these devices to watch their media content.  Thus, the demand for movies and television programs available for online remote filtering is larger today than ever.

**VidAngel's Service**

37.     To address the substantial demand for online filtering, VidAngel was formed in October 2013 to provide customers the ability to control the content they view at home.  While VidAngel's technology has evolved over time, paragraphs 38 through 47 below describe features common to both VidAngel's 2015-16 technology, its current technology and a modified version of its 2015-16 technology.

38.     Using VidAngel's proprietary tagging application, customers may select their own filtering options and stream content they owned to their personal devices.  VidAngel's service allows customers to stream filtered feature films and television shows via the Internet to a wide range of devices, including desktop computers, laptop computers, iPads, smart phones, and televisions (through devices such as Roku, Google Chromecast, and Apple TV).

39.     VidAngel makes available to users a catalog of motion pictures that may be filtered by users.  VidAngel's filtering technology divides each feature film or television show into hundreds or sometimes thousands of small segments (ranging from 2 tenths of a second to 10 seconds in length).  Each segment is identified and "tagged" as associated with one or more available categories of filterable content.

40.     Once a user selects a motion picture from VidAngel's catalogs for purchase (under the 2015-16 business model) or paid streaming from an LSS (under the current model), the user is presented with a listing of the various types of potentially objectionable content identified in the purchased work, as well as the number of occurrences of each such type of content within the work.  The user may then select the types of content he or she wishes to have silenced or skipped.  The user may choose from over 80 categories of filters and set any combination of filters in the following categories:  profanity, sex/nudity/immodesty, violence, drug/alcohol use, and objectionable/disturbing.  The user's unique selection of filters creates a custom filter.  Filters may be modified before and during the viewing process and are saved to the user's unique customer ID.

41.     All users must select at least one filter, and each user has the option to select as many other filters as apply to that content, thus permitting users in most instances to select many thousands of different combinations of filters, thereby making a customer's viewing experience individualized and unique.

42.     When a user selects a filter category and streams a feature film or television show, all segments tagged for that filter are omitted from the stream.  The filters have the effect of skipping audiovisual content or muting audio content in categories created by VidAngel and

selected by the user.  If the filter concerns audiovisual content, the user's device will not download the segments that have been tagged for that filter.  If the filter affects only the audio, the user's device downloads a version of the segment with the voice soundtrack muted while other soundtracks continue to play, while leaving the video portion unchanged.

43.     VidAngel delivers filtered content to users by streaming it over the Internet using a video content delivery protocol called HTTP Live Streaming[1] ("HLS").  HLS divides the audiovisual content into short segments that are frequently less than 4 seconds and never more than 10 seconds that are delivered separately to a user's device when viewed.  The user's device downloads each segment individually.  At the beginning of an HLS streaming session, the user's device downloads an index file which provides the device with a list of segment files that the device can then request and play to display the content.[2]  At no point in this process does VidAngel create a fixed copy of an altered version of the motion picture.

44.     Subscribers may view the stream instantaneously on any VidAngel-supported device, including Roku, Apple TV, Android TV, Amazon Fire TV, Android tablets/phones, Chromecast, iPad/iPhone and desktop or laptop computers.

45.     VidAngel's service relies on HTTP Live Streaming ("HLS") encryption to let customers enjoy video over HTTP for playback on devices running iOS, (including the iPhone, iPad, iPod Touch), Roku, Chromecast, Android devices, and desktop and laptop computers.  VidAngel's service utilizes the Advanced Encryption Standard ("AES"), as well as other technologies, to seamlessly protect content from non-authorized streaming, piracy, and

---

[1] R. Pantos, W. May, "HTTP Live Streaming," Internet Engineering Task Force, Apr. 4, 2016 (retrieved from https://tools.ietf.org/html/draft-pantos-http-live-streaming-19, Sept. 3, 2016)
[2] *Id.*

redistribution by others, with no detectable difference to video playback.  On the 2015-16 technology, VidAngel employs a one-screen policy for playback based on the user's account, IP address and other information.  On the current technology, VidAngel honors the per-screen policy of the LSS.

46.     VidAngel's filtering service has a transformative effect on motion pictures and facilitates permissible space-shifting.  Removal of mature content has such a powerful transformative effect that only then will certain audiences watch those movies.  Religious convictions, and parental views about what is appropriate for children, are real and powerful and in fact matter more to VidAngel's customers than *anything else* about a particular title.  VidAngel's transformative filtering does not undermine the value of or market for Defendants' works.  To the contrary, VidAngel's service benefits Defendants' bottom line by expanding their potential audience to include consumers who would not purchase a disc or an LSS stream of their titles absent a convenient filtering and streaming service.

47.     Additionally, VidAngel's 2015-16 and current technologies comply with the FMA, which immunizes from copyright liability "a computer program or other technology that enables" home filtering, provided that it does not create "[a] fixed copy of the altered version of the motion picture."  *See* 17 U.S.C. § 110(11).  In accordance with the FMA's express terms, VidAngel's technologies enable a filtering service that makes "imperceptible" "limited portions of a motion picture", the filtering is done "at the direction of a member of a private household," and "transmitted for private home viewing."  *See id.*  Further, whether using a physical disc or a LSS stream purchased by the VidAngel user, all filtering begins with and thus comes "from an authorized copy," and no "fixed copy" of the filtered movie is ever created.  *See id.*

## FIRST CAUSE OF ACTION

### (Declaratory Relief Regarding Legality Of VidAngel's 2015-16 Technology)

48.     VidAngel incorporates by reference the above paragraphs of this Complaint as if set forth fully herein.

49.     An actual controversy has arisen and now exists between VidAngel and Defendants concerning whether VidAngel's 2015-16 technology is legal under copyright law. Defendants contend that VidAngel infringes their exclusive rights to copy and make public performances of their copyrighted works in violation of 17 U.S.C. § 101 *et seq.*, whereas VidAngel contends that its 2015-16 technology is fully consistent with the FMA, the fair use doctrine, the Digital Millennium Copyright Act ("DMCA") (codified at 17 U.S.C. §§ 1201-1204), and otherwise complies with copyright law.

50.     Using the technology and business model it employed during 2015-16, VidAngel lawfully purchased numerous physical copies of each motion picture in DVD and/or Blu-ray format before selling the physical DVDs and/or Blu-ray discs to its customers.  VidAngel spent about one-third of its gross revenues just to purchase those copies from various public and private sellers and spent over $2 million doing so.

51.     Following its purchase from VidAngel's suppliers, VidAngel entered each DVD (including Blu-ray discs) it purchased into an inventory management application database and assigned a unique barcode to each physical disc case.  When a consumer purchased a disc, that particular disc was, and virtually always remains, held in VidAngel's vault for the customer and VidAngel recorded the purchase by assigning the unique barcode for that disc case to its owner.  Only a customer who owned a disc in the vault or took delivery of it from VidAngel

could access the title for filtering. The vault is locked and under 24-hour surveillance using multiple video cameras.

52. VidAngel's trained personnel and contractors carefully reviewed all titles available for resale for potentially objectionable content. VidAngel developed more than 80 codes or tags for different kinds of content that a viewer might prefer not to see or hear.

53. Before watching a movie or television episode, a customer had to purchase a physical disc containing the complete, unaltered version of the title from VidAngel. Every disc available for purchase by a customer was first lawfully acquired by VidAngel as described above. VidAngel would not provide its filtering service if the disc were not in its or the customer's possession. That requirement ensured that the one-to-one correspondence between a disc and a user was maintained.

54. Users were able to access the contents of their discs only by owning them. Once a purchase transaction occurred, the disc was removed from available inventory and assigned to that customer's unique user ID. After a customer purchased a physical disc and selected his or her desired filters, the user was permitted to play a filtered version of the work on only one device screen at a time. VidAngel used a software program to automatically allow read-access for the purpose of mounting the DVD files for uploading onto a computer, in the process removing restrictions on DVD encryption. VidAngel filtered the specific content identified by its customer to be screened as the content was streamed to the customer but made no permanent fixed copy of the work as streamed. Neither VidAngel nor its users altered the underlying work on the disc.

55.     VidAngel designed and engineered its filtering service to promote compliance with copyright law and the FMA.  For example, just as a physical DVD could not be played simultaneously on multiple devices, VidAngel restricted a user's playback to one device at a time.  VidAngel also streamed a work to just one of a user's registered devices at a time.

56.     VidAngel's 2015-16 technology created an intermediate copy of a motion picture for precisely one reason: so that it could send filtered streams to its customers' homes.  Making intermediate copies to further the ultimate public good and purpose of the Copyright Act has long been recognized as classic fair use.  *See, e.g.*, *Sega Enters.Ltd. v. Accolade Inc.*, 977 F.2d 1510 (9th Cir. 1992), *as amended* (Jan. 6, 1993); *Sony Comput. Entm't, Inc. v. Connectix Corp.*, 203 F.3d 596, 602-08 (9th Cir. 2000). And here the ultimate non-infringing use—viewing a filtered movie at home—is one Congress specifically sanctioned.

57.     VidAngel desires a judicial determination of the legality of its 2015-16 technology, and the respective rights and duties of the parties.  A judicial declaration regarding the legality of this technology under the FMA, the fair use doctrine, the DMCA, and copyright law is necessary and appropriate so that VidAngel and Defendants may ascertain their rights and duties under copyright law.

## SECOND CAUSE OF ACTION

### (Declaratory Relief Regarding Legality of VidAngel's Current Technology)

58.     VidAngel incorporates by reference the above paragraphs of this Complaint as if set forth fully herein.

59.     An actual controversy has arisen and now exists between VidAngel and Defendants concerning whether VidAngel's current technology is legal under copyright law.

Defendants contend that VidAngel infringes their exclusive rights to copy and make public performances of their copyrighted works in violation of 17 U.S.C. § 101 *et seq.*, whereas VidAngel contends that its current technology is fully consistent with the FMA, the fair use doctrine, the DMCA and otherwise complies with copyright law.

60.     In mid-2017, VidAngel completed its development of a new version of its filtering technology to address concerns raised by certain motion picture studios.  VidAngel has begun using its new technology to provide filtering services for motion pictures.

61.     Rather than require that its subscribers purchase a physical disc, VidAngel's new technology works in conjunction with the transmission of a movie from an LSS.   While the movie streams from the LSS to a device operated by VidAngel, VidAngel simultaneously streams the movie to a device operated by its customer, applying the customer's selected filters as the movie streams.  To accomplish this task, VidAngel's new filtering technology requires two sets of operations: (1) the creation of available filters, and (2) the streaming of the movie.

62.     The first operation is accomplished as follows:

a.      VidAngel purchases a digital transmission of a motion picture from an LSS (e.g., Amazon Instant Video).

b.      A VidAngel "tagger" (a person responsible for marking or "tagging" content a customer might find objectionable) then initiates a stream of a particular motion picture to be played using the LSS's web-based video streaming software.[3]

---

[3] In the ordinary course of its business, the LSS makes a copy of each motion picture it is authorized to stream and sends the copies to a cloud browser, e.g., a virtual copy of Google Chrome hosted in the cloud through the LSS's own Web-based app. Because an LSS uses its

    c.      As the streamed motion picture is processed by the LSS's video player app, the tagger generates a framebuffer version of the movie data.[4] Although the audio data does not run through the framebuffer, it does run through the operating system's audio bus, allowing VidAngel to capture it as the movie plays using the system's soundcard hardware.

    d.      The VidAngel tagger then saves the created copy of the motion picture to a cloud storage location.

    e.      Working from the copy, the VidAngel tagger then generates eight versions of the movie, each at different bitrates.[5] Each bitrate version is then cut into eight-second segments,[6] and the segmented pieces of the motion picture are then encrypted and uploaded to an S3 cloud storage bucket.[7]

---

own player to manage digital rights (including any potential encrypting and decrypting of video segments), the VidAngel tagger can access the stream through the cloud browser via the LSS's player software. VidAngel *does not* decrypt the motion picture. Rather, the VidAngel tagger consumes the stream post-decryption—exactly as intended for viewing by the motion picture copyright owners.

[4] A "framebuffer" is a portion of random access memory ("RAM") containing a bitmap image file format used to store and refresh a video display from a memory buffer containing a complete frame of data. In other words, the framebuffer version is essentially a digital copy of the video created from the video stream.

[5] The term "bitrate" refers to the number of bits per second that can be transmitted along a digital network.  When a video is streamed over a network, the bitrate is limited by the network speed. Videos streamed at a higher bitrate can be of higher quality, but they also require greater network bandwidth than videos streamed at a lower bitrate.

[6] Cutting the video into eight-second segments enables VidAngel to offer its customers the highest quality streams of filtered works, while adjusting to ordinary fluctuations in the customer's network speed as the video plays. For example, a customer with a high speed Internet connection may initiate a video stream at the highest available bitrate. If the customer's Internet speed drops while the video is streaming (for example, because another household member initiates a separate video stream on another device), VidAngel's streaming application will automatically begin delivering the lower bitrate segments without interruption to the customer's playback experience.

[7] An S3 (Amazon Simple Storage Service) cloud storage bucket is object storage with a simple

f.      At this point, the VidAngel tagger initiates a tagging session by making a temporary copy of the lowest bitrate segments, and placing that temporary copy in a separate bucket.[8]   The tagger then downloads the temporary copy to the tagger's browser.

g.      During the tagging session, the tagger creates video tags identifying potentially filterable content.   As each tag is created, the segment corresponding to the time where that filterable content is located is fleetingly copied to a "keyframe generator."[9]

h.      The keyframe generator marks the location of each tag boundary in the stream (i.e., the beginning and end time) and copies each segment back to the working bucket, in the process overwriting (and thus destroying) the existing segment.

i.      When the motion picture's tagging is completed, the tagger uses the tags to create a "published" version of the master segments in a location that the Web and mobile apps can access them.   Those segments are then encrypted and the segments in the working bucket are destroyed.

j.      VidAngel next uploads the encrypted segments to a content delivery

---

web storage service interface to store and retrieve data from anywhere on the Web with very high durability.

[8] Placing the temporary copy in a separate bucket prevents any corruption of the master segments.

[9] In compressed video, a "key frame" is a full information frame that serves as a marker point for subsequent frames; frames coming after a key frame only store information that has changes from the key frame.  By annotating each potential tag with a key frame, the system can generate dynamic clips based on tag boundaries without losing pieces of video.

network ("CDN") edge server.[10]

63.　　With the first operation complete, VidAngel is ready to provide its filtering service to consumers.  That second operation works as follows:

    a.　　To watch filtered, streamed content, a consumer must open an account with an LSS (e.g., Amazon Instant Video, Google Play, etc.).

    b.　　The consumer must then link his or her LSS account credentials with his or her VidAngel account.[11]

    c.　　The consumer may browse VidAngel's content library to select a motion picture for which VidAngel offers filtering services.

    d.　　Upon selection of a motion picture, VidAngel either accesses the consumer's subscription video-on-demand ("SVOD") with his or her LSS, or accesses a stream the consumer has already purchased from the LSS. For the consumer's convenience, VidAngel may with the consumer's authorization purchase a stream of the requested motion picture on the consumer's behalf.

    e.　　When the consumer initiates the stream using VidAngel's player, VidAngel simultaneously initiates the stream from the LSS.  Rather than streaming the motion picture to the consumer's device, the LSS delivers

---

[10] A content delivery network is a group of servers, geographically distributed, that improves the speed of content delivery by allowing customers to get the requested files from a server closer to them.  It is common practice in the video industry to deliver video files through a CDN.

[11] VidAngel does not store customers' account credentials on its servers. Customers must provide their LSS account credentials each time they use VidAngel's services.

the video stream to VidAngel.[12]

    f.      While the LSS is streaming the motion picture to VidAngel, VidAngel simultaneously streams the copy of the motion picture stored on its CDN server to the consumer using the appropriate bitrate segments.

    g.      To the extent any segments of the motion picture do not correspond to a filter chosen by the consumer, those segments are streamed directly to the consumer's device.

    h.      To the extent segments do correspond to selected filters, requests for those segments are sent to a "clip generator,"[13] which downloads the segments from the S3 cloud storage bucket, decrypts the encryption supplied by VidAngel, and filters the audio and/or video content according to the customer's filter selections. The filtered bits are then re-encrypted and transmitted to the consumer's player and are simultaneously deleted from the clip generator.

    64.      VidAngel desires a judicial determination of the legality of its current technology,

---

[12] VidAngel receives the actual stream paid for by the user to ensure that the LSS treats it as a valid stream, thus preventing consumers from receiving more than they have paid for by, for example, watching a motion picture filtered on VidAngel using one device and simultaneously playing it unfiltered on a different device. Because VidAngel receives an authorized stream from the LSS, if a consumer tries to watch it simultaneously on a second device using the LSS's app, the LSS is alerted to the existence of multiple streams and can enforce any requirements or limitations concerning the use of a second device. VidAngel continuously monitors the stream so that if the LSS cuts off or stops providing its stream for any reason, VidAngel will also terminate its stream. A consumer therefore never has any greater ability to watch content using VidAngel's service than if he or she had purchased that content directly from the LSS.

[13] A "clip generator" is a VidAngel computer program that performs filtering by generating new clips in real time while omitting content the user has chosen to filter. The "clip generation" process uses only RAM—it does not result in the creation of a permanent copy of the filtered work.

and the respective rights and duties of the parties.  A judicial declaration regarding the legality of

this technology under the FMA, fair use doctrine, the DMCA, and copyright law is necessary and

appropriate so that VidAngel and Defendants may ascertain their rights and duties under

copyright law.

### THIRD CAUSE OF ACTION

### (Declaratory Relief Regarding Legality of Modified Version of VidAngel's 2015-16 Technology)

65.     VidAngel incorporates by reference the above paragraphs of this Complaint as if

set forth fully herein.

66.     An actual controversy has arisen and now exists between VidAngel and

Defendants concerning whether a modified version of VidAngel's 2015-16 technology is legal

under copyright law.  Defendants contend that VidAngel infringes their exclusive rights to copy

and make public performances of their copyrighted works in violation of 17 U.S.C. § 101 *et seq.*,

whereas VidAngel contends that its technology is fully consistent with the FMA, the fair use

doctrine, the DMCA, and otherwise complies with copyright law.

67.     VidAngel is prepared to implement a modified version of its 2015-16 technology

that does not require decryption of physical discs.  Rather than remove restrictions on DVD

encryption of the lawfully purchased discs, VidAngel leaves those restrictions in place.  It would

create a copy of the motion picture from a physical disc by capturing the output of the lawfully

purchased disc playing on a DVD player.  It would then tag the output for potentially

objectionable content, upload encrypted bits at multiple bitrates to a secure location in the cloud,

and apply the user's selected filters to transmit filtered content to consumers who lawfully own a copy of that motion picture.

68.     VidAngel desires a judicial determination of the legality of this modified version of its 2015-16 technology, and the respective rights and duties of the parties.  A judicial declaration regarding the legality of this technology under the FMA, the fair use doctrine, the DMCA, and copyright law is necessary and appropriate so that VidAngel and Defendants may ascertain their rights and duties under copyright law.

## PRAYER FOR RELIEF

WHEREFORE, VidAngel prays for judgment against Defendants as follows:

1.      On VidAngel's First Cause of Action, which asserts a declaratory relief claim against Defendants, for a declaration that VidAngel's 2015-16 technology is permissible under the FMA, the fair use doctrine, the DMCA and all other copyright laws;

2.      On VidAngel's Second Cause of Action, which asserts a declaratory relief claim against Defendants, for a declaration that VidAngel's current technology is permissible under the FMA, the fair use doctrine, the DMCA, and all other copyright laws;

3.      On VidAngel's Third Cause of Action, which asserts a declaratory relief claim against Defendants, for a declaration that VidAngel's modified version of its 2015-16 technology is permissible under the FMA, the fair use doctrine, the DMCA, and all other copyright laws; and

4.      For such other relief as the Court deems just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

VidAngel demands jury trial on all issues so triable.

DATED this 31st day of August, 2017.

DURHAM JONES & PINEGAR, P.C.

    /s/ Douglas B. Thayer
Douglas B. Thayer
*Attorneys for Plaintiff VidAngel, Inc.*

<u>Plaintiff's address</u>:
295 W. Center St.
Provo, Utah 84601