Douglas B. Thayer (Bar No. 8109)
Andy V. Wright (Bar No. 11071)
Cole L. Bingham (Bar No. 14131)
DURHAM JONES & PINEGAR, P.C.
3301 N. Thanksgiving Way, Suite 400
Lehi, Utah 84043
Telephone: (801) 375-6600
Facsimile: (801) 375.3865
Email: dthayer@djplaw.com
        awright@djplaw.com
        cbingham@djplaw.com

David Quinto (Cal. Bar No. 106232)
VIDANGEL, Inc.
3007 Franklin Canyon Dr.
Beverly Hills, CA 90210-1633
Telephone:  (213) 604-1777
Email: dquinto@VidAngel.com (pro hac vice)

Ryan G. Baker (Cal. Bar No. 214036)
  rbaker@bakermarquart.com (pro hac vice)
Jaime Marquart (Cal. Bar No. 200344)
  jmarquart@bakermarquart.com (pro hac vice)
Scott M. Malzahn (Cal. Bar No. 229204)
  smalzahn@bakermarquart.com (pro hac vice)
Brian T. Grace (Cal. Bar No. 307826)
  bgrace@bakermarquart.com (pro hac vice)
BAKER MARQUART LLP
2029 Century Park East, Sixteenth Fl.
Los Angeles, California 90067
Telephone:     (424) 652-7800
Facsimile:      (424) 652-7850

*Attorneys for Plaintiff VidAngel, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| VIDANGEL, INC.,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>SULLIVAN ENTERTAINMENT, et al.,<br><br>　　　　Defendants. | Case No. 2:17cv00989 DN<br><br>**VIDANGEL INC.'S MOTION FOR EX PARTE TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION; MEMORANDUM IN SUPPORT**<br><br>Chief District Judge David Nuffer<br><br>Trial Date:     None Set<br><br>[ORAL ARGUMENT REQUESTED} |

TABLE OF CONTENTS

Statement of Facts ................................................................................................................. 2

Argument ............................................................................................................................. 12

I.      LEGAL AUTHORITY ............................................................................................. 12

II.     VIDANGEL IS LIKELY TO SUFFER IRREPARABLE HARM ABSENT
        A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION. .... 13

III.    VIDANGEL IS LIKELY TO SUCCEED ON THE MERITS OF ITS ACTION ........... 13

        A. VidAngel's Stream-Based Method Is Protected by the Safe Harbor
           Provision of the Family Movie Act. .................................................................... 13

        B. The Legislative History Confirms That Congress Intended the FMA to
           Ensure That Families Would Have the Right to Control the Content That Enters
           Their Homes ....................................................................................................... 16

        C. VidAngel's Stream-Based Service Is Also a Fair Use. ............................................. 17

           1. Market Effect ................................................................................................. 18

           2. Purpose and Character of the Use ................................................................... 19

           3. Nature of the Copyrighted Work ..................................................................... 21

           4. Amount and Substantiality of Copying ............................................................ 22

IV.     THE BALANCE OF HARM WEIGHS IN FAVOR OF VIDANGEL ........................... 23

V.      THE PUBLIC INTEREST, AS EXPRESSED BY CONGRESS,
        FAVORS VIDANGEL'S REQUEST ........................................................................... 23

VI.     NO BOND SHOULD BE REQUIRED ........................................................................ 24

VII.    VIDANGEL RESPECTFULLY REQUESTS EXPEDIENCY ....................................... 24

Conclusion ........................................................................................................................... 25

TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amoco Prod. Co. v. Village of Gambell*,
    480 U.S. 531 (1987)........................................................................................................26

*Authors Guild v. Google, Inc.*,
    804 F.3d 202 (2d Cir. 2015)....................................................................................23, 25

*Batjac Prods. Inc. v. GoodTimes Home Video Corp.*,
    160 F.3d 1223 (9th Cir.1998) .......................................................................................24

*Blanch v. Koons*,
    467 F.3d 244 (2d Cir. 2006).........................................................................................21

*Burlingame v. Milone*,
    62 Misc. 2d 853, 310 N.Y.S.2d 407 (N.Y. S. Ct., Nassau Cty., 1970)....................15

*Cambridge Univ. Press v. Patton*,
    769 F.3d 1232 (11th Cir. 2014) ...................................................................................22

*Campbell v. Acuff-Rose Music, Inc.*,
    510 U.S. 569 (1994).........................................................................................20, 21, 22

*CCCO-W. Region v. Fellows*,
    359 F. Supp. 644 (N.D. Cal. 1972) ..............................................................................15

*Columbia Pictures Indus., Inc. v. Miramax Films Corp.*,
    11 F. Supp. 2d 1179 (C.D. Cal. 1998) .........................................................................21

*Disney Enterprises, Inc., et al. v. VidAngel, Inc.*,
    No. 2:16-cv-04109-AB-PLA ..........................................................................................4

*Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*,
    356 F.3d 1256 (10th Cir. 2004) ..............................................................................15, 16

*Doran v. Salem Inn, Inc.*,
    422 U.S. 922 (1975).......................................................................................................15

*Elvis Presley Enters. v. Passport Video*,
    349 F.3d 622 (9th Cir. 2003) ........................................................................................24

*Harper & Row v. National Enterprises*,
    471 U.S. 539 (1985).................................................................................................21, 24

*Hill's Pet Nutrition, Inc. v. Nutro Prods., Inc.*,
    258 F. Supp. 2d 1197 (D. Kan. 2003) ..........................................................................16

ii

*John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc.*,
    588 F.2d 24 (2d Cir.1978) ................................................................................16

*Johnson v. Dist. Ct. of the Seventeenth Judicial Dist.*,
    195 Colo. 169 (Colo. S. Ct. 1978) (en banc) ....................................................15

*Kelly v. Arriba Soft Corp.*,
    336 F.3d 811 (9th Cir. 2002) ...........................................................................26

*Leibovitz v. Paramount Pictures Corp.*,
    137 F.3d 109 (2d Cir. 1998)..............................................................................24

*MCA, Inc. v. Wilson*,
    677 F.2d 180 (2d Cir. 1981)..............................................................................21

*Paer v. Guhl*,
    236 Ga. 768 (Ga. S. Ct. 1976).........................................................................15

*Perfect 10, Inc. v. Amazon.com, Inc.*,
    508 F.3d 1146 (9th Cir. 2007) ..........................................................23, 24, 25, 26

*Roso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co.*,
    749 F.2d 124 (2d Cir.1984)...............................................................................16

*Seltzer v. Green Day, Inc.*,
    725 F.3d 1170 (9th Cir. 2013) ..........................................................................22

*Semmes Motors, Inc. v. Ford Motor Co.*,
    429 F.2d 1197 (2d Cir.1970).............................................................................16

*Sortex Co. of N. Am. v. Mandrel Indus., Inc.*,
    226 F. Supp. 995 (W.D. Mich. 1964) ...............................................................15

*Stewart v. Abend*,
    495 U.S. 207 (1990)..........................................................................................20

*Tri-State Generation and Transmission Ass'n v. Shoshone River Power, Inc.*,
    805 F.2d 351 (10th Cir. 1986) .....................................................................16, 17

*United Artists Corp. v. Gladwell*,
    373 F. Supp. 247 (N.D. Ohio 1974)..................................................................15

*A.V. ex rel. Vanderhye v. iParadigms*,
    LLC, 562 F.3d 630 (4th Cir. 2009)................................................................22, 24

*Winnebago Tribe of Neb. v. Stovall*,
    341 F.3d 1202 (10th Cir. 2003) ........................................................................27

*Winter v. Natural Resources Defense Council*,
129 S. Ct. 365 (2008) ................................................................................................15, 26

**Statutes**

U.S.C. §1201(a) .............................................................................................................7

17 U.S.C. § 110(11) ..............................................................................11, 13, 16, 17, 18

17 U.S.C. § 107 ..........................................................................................................9, 25

17 U.S.C. § 106 ....................................................................................................7, 13, 17

17 U.S.C. §§ 1201-04 .....................................................................................................4

Federal Rule of Civil Procedure 65 ...........................................................................4, 27

**Other Authorities**

150 CONG. REC. H2114-01 (April 19, 2005) (statement of Rep. Lamar Smith)............................19

150 CONG. REC. H7654-01 (Sept. 28, 2004)................................................................17

150 CONG. REC.. H7654-01 (Sept. 24, 2004) (statement of Rep. Sensenbrenner) ........................19

151 CONG. REC. S501 (daily ed. Jan. 25, 2005)...........................................................18

H.R. REP. No. 109-33(I) ...............................................................................................20

COMES NOW Plaintiff VidAngel, Inc. ("VidAngel"), and hereby moves the Court, pursuant to Fed. R. Civ. P. 65(a) and 65(b), to temporarily restrain and preliminarily enjoin Defendants MVL Film Finance LLC, New Line Productions, Inc., and Turner Entertainment Co. (collectively, the "Studio Subsidiary Defendants") from seeking contempt or bringing any collateral legal proceeding should VidAngel filter and stream motion pictures whose copyrights they own to VidAngel's customers if VidAngel does so (i) without decrypting content or otherwise violating their rights under the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. §§ 1201-04, and (ii) without causing any of the alleged economic harms that led to the issuance of the preliminary injunction entered December 12, 2016, in *Disney Enterprises, Inc., et al. v. VidAngel, Inc.*, No. 2:16-cv-04109-AB-PLA, filed June 9, 2016, in the Central District of California, Western Division (the "California Litigation").

VidAngel is in imminent danger of having to cease business operations and could be forced to convert its Chapter 11 bankruptcy filing into a Chapter 7 proceeding if it cannot quickly increase its subscriber base. VidAngel wants to avoid intruding on this Court's process of deciding Defendants' motion to dismiss, transfer or stay this action (Dkt. 58, 91, 99) in light of their February 14, 2018 decision to file proofs of claim with the Utah Bankruptcy Court, but VidAngel does not have the luxury of time. It must attract more customers to stave off insolvency and avoid irreparable injury. To attract and keep more customers, it must be able to offer more content. VidAngel's application, if granted, will permit it to offer more content. And, as shown by a university study completed this week by two respected and independent researchers who used VidAngel's data to study the market for filtered motion picture content, the Studio Subsidiary Defendants will not be harmed by the relief VidAngel now seeks.

Accordingly, on July 4, 2018, VidAngel gave written notice of this motion to counsel for the Studio Subsidiary Defendants, who has stated that they will oppose this motion.[1]

VidAngel respectfully requests that the Studio Subsidiary Defendants be temporarily restrained on an ex parte basis pending the Court's hearing and ruling on Plaintiff's motion for preliminary injunction, which may be expedited as appropriate. VidAngel submits this Motion together with a supporting Memorandum of Points and Authorities setting forth, in detail, the grounds for its Motion.

Statement of Facts

1.   The Complaint filed by Disney Enterprises, Inc., et al. (collectively, the "California Plaintiffs") in the California Litigation concerned the business model and technology VidAngel was using in 2016, and specifically challenged VidAngel's practice of decrypting DVD copies of the California Plaintiffs' motion pictures on DVD or Blu-ray discs to permit potentially offensive content to be "tagged,' selling other copies of those motion pictures on DVD or Blu-ray discs to consumers before streaming the filtered contents of the decrypted discs to those consumers, and offering to buy those discs back at a reduced price after the consumers had viewed their contents.[2]

2.   The Complaint in the California Litigation alleged that VidAngel competed unfairly with streaming services licensed by the California Plaintiffs in that by selling, buying back, and re-selling discs, VidAngel could undercut the prices charged by licensed streaming services ("LSSs") (notwithstanding that the California Plaintiffs refused to sell VidAngel a streaming license). [3]

---

[1] Declaration of David W. Quinto ("Quinto Decl.") dated July 5, 2018, ¶ 36, Ex. M.
[2] *See* Quinto Decl., ¶ 3 and Exhibit A thereto.
[3] *Id.*, ¶ 4 and Exhibit A thereto.** If the California Plaintiffs were willing to allow VidAngel to become an LSS, customers could then both purchase or rent motion pictures from VidAngel and receive VidAngel's filtering services. VidAngel would, in turn, pay the copyright owners directly for each licensed stream.

3.   On August 22, 2016, the California Plaintiffs moved for the entry of a preliminary injunction based on their argument that they faced a likelihood of suffering an economic injury in three ways: (i) because VidAngel customers could watch streamed, filtered motion pictures for a lower cost than customers of LSSs were required to pay to watch unfiltered motion pictures, VidAngel threatened to hurt the California Plaintiffs' ability to negotiate maximally profitable licenses with LSSs; (ii) if the California Plaintiffs sold "windowing" opportunities to particular LSSs allowing them to make certain motion pictures available to consumers ahead of their competitors and if the California Plaintiffs also chose to sell DVDs during the "window" periods, the ability of consumers to watch filtered, streamed motion pictures might decrease the value of the "windows"; and (iii) if the California Plaintiffs chose to release motion pictures on DVDs when they authorized LSSs to "sell" digital copies but before they authorized them to "rent" digital copies, that "windowing" opportunity might also become less valuable to LSSs.[4]

4.   Although money damages do not ordinarily constitute an irreparable injury, the California Plaintiffs argued that if VidAngel were unable to pay damages, they would be irreparably harmed.[5]

5.   On December 12, 2016, the court in the California Litigation granted the motion and issued an order preliminarily enjoining VidAngel from:

(1) circumventing technological measures protecting Plaintiffs'

copyrighted works on DVDs, Blu-ray discs, or any other medium;

(2) copying Plaintiffs' copyrighted works, including but not limited to

copying the works onto computers or servers;

(3) streaming, transmitting or otherwise publicly performing or

---

[4] *Id.*, ¶ 5.
[5] *Id.*, ¶ 6.

displaying any of Plaintiffs' copyrighted works over the Internet (through

such websites as VidAngel.com), via web applications (available through

platforms such as the Windows App Store, Apple's App Store, the

Amazon App Store, Facebook or Google Play), via portable devices

(such as through applications on devices such as iPhones, iPads, Android

devices, smart phones or tablets), via media streaming devices (such as

Roku, Chromecast or Apple TV), or by means of any other device or

process; or

       (4) engaging in any other activity that violates, directly or indirectly,

Plaintiffs anti-circumvention right under § 1201 of the Copyright Act, 17

U.S.C. §1201(a), or infringing by any means, directly or indirectly,

Plaintiffs' exclusive rights under § 106 of the Copyright Act, 17 U.S.C. §

106.[6]

6.   The preliminary injunction order is not tethered to the conduct that gave rise to it,

does not exempt its application to business methods that do not violate the DMCA and do not

cause any likelihood of economic injury, and issued without any consideration of VidAngel's as-

yet nonexistent "stream-based" technology that avoids any conflict with the DMCA and

eliminates all potential economic injuries the California Plaintiffs had alleged.[7]

7.   After the preliminary injunction issued in December 2016, VidAngel ceased

filtering and streaming all motion pictures for which it did not own the distribution rights --

meaning that it stopped offering more than 99 percent of its content--while it developed the

technology behind its current "Stream-Based" service.[8]

---

[6] *Id.*, ¶ 7 and Exhibit B thereto.
[7] *See id.* ¶8 and Exhibit B thereto.
[8] *Id.*, ¶ 9.

8.   VidAngel's new Stream-Based service, completed after the preliminary injunction issued, requires that its customers purchase the right to watch any motion picture from an LSS before VidAngel will stream it to them, filtered as requested.[9]

9.   On June 13, 2017, following a break-neck development effort, VidAngel announced the launch of its Stream-Based service.[10]

10. As VidAngel has alleged in its Amended Complaint in this action, pursuant to its Stream-Based service, VidAngel "tags" motion pictures for content its customers might find objectionable by purchasing streams of those motion pictures from LSSs, capturing the already decrypted streams without circumventing technological protection measures ("TPMs"), marks or "tags" all potentially offensive language and scenes, creates a tagged copy of each motion picture at each of eight bitrates, chops each of the eight versions into encrypted bits of not more than 10 seconds, and uploads them to a secure location in the Cloud.[11]

11. As VidAngel has also alleged in its Amended Complaint, pursuant to its Stream-Based service, VidAngel requires that each customer who wishes to watch a movie filtered by VidAngel first pay an LSS for the right to have it streamed to him or her.[12]

12. After a customer, or VidAngel acting on the customer's behalf, orders a stream of a motion picture from an LSS, the stream is routed to VidAngel.[13]

13. VidAngel then streams to the customer the bits that do not contain the language or scenes the customer requested not to hear or see.[14]

14. To improve the customer's viewing experience, VidAngel can stream a motion

---

[9] *Id.*, ¶ 10.
[10] *Id.*, ¶ 11.
[11] *Id.*, ¶ 12; *see also* Dkt. 40.
[12] *Id.*, ¶ 13; *see also* Dkt. 40.
[13] *Id.*, ¶ 14.
[14] *Id.*, ¶ 15.

picture to a customer at different bitrates, as appropriate for the movie's format and the customer's bandwidth, and can seamlessly switch to a more appropriate bandwidth as the customer's available bandwidth fluctuates during the course of a two-hour movie.[15]

15. In the California Litigation, VidAngel twice asked the court to address the overbreadth of the preliminary injunction,  first by clarifying that a filtering service that did not violate the DMCA and that could not cause any of the potential economic harms alleged by the California Plaintiffs would be protected by the "fair use" provision of copyright law, 17 U.S.C. § 107, and, hence, would not violate the preliminary injunction, and second by seeking clarification that the use of a filtering technology and business model that were more than merely colorably different from the technology and business model at issue in the California Litigation would not result in a finding of contempt.[16]

16. The California court refused to address either request for clarification on the merits, instead explaining that VidAngel should seek declaratory relief.[17]

17. After VidAngel launched its Stream-Based service in June 2017, it resumed filtering and streaming motion pictures whose copyrights were owned by the Studio Subsidiary Defendants.[18]

18. VidAngel was filtering and streaming motion pictures whose copyrights were owned by the Studio Subsidiary Defendants when it filed this action on August 31, 2017.[19]

19. Almost a month after VidAngel commenced this action, on September 29, 2017, the California Plaintiffs filed a stipulation and proposed order in the California Litigation to add the Studio Subsidiary Defendants as additional plaintiffs in the California Litigation.[20]

---

[15] *Id.*, ¶ 16.
[16] *Id.*, ¶ 17.
[17] *Id.*, ¶ 18 and Exhibits C and D thereto.
[18] *Id.*, ¶ 19.
[19] *Id.*, ¶ 20.

20. On October 5, 2017, the court in the California litigation entered an order allowing the filing of the proposed amended complaint adding the Studio Subsidiary Defendants as additional plaintiffs in the California Litigation.[20]

21. Ten weeks after VidAngel brought this action, the California Plaintiffs' attorney, Kelly Klaus, demanded on November 6, 2017, that VidAngel stop tagging and streaming motion pictures whose copyrights were owned by the Studio Subsidiary Defendants.[21]

22. VidAngel acceded to that demand and ceased making motion pictures whose copyrights were owned by the Studio Subsidiary Defendants available to its customers approximately one and a half months after commencing this action.[22]

23. Notwithstanding that the California court has twice declined to say that VidAngel's use of its Stream-Based service would be a contempt of the preliminary injunction order, the Studio Subsidiary Defendants affirmed on May 21, 2018, that they will seek contempt if VidAngel uses its stream-based method to filter and stream any motion pictures whose copyrights they own.[24]

24. The Studio Subsidiary Defendants did so notwithstanding that their attorney had represented to the California court during oral argument on the California Defendants' preliminary injunction motion that a filtering service would be protected by the Family Movie Act, 17 U.S.C. § 110(11), if it worked in conjunction with an LSS:

> THE COURT: What's your response to the notion that—to Mr. Quinto's point that you can't filter without ripping?
> MR. KLAUS: That is wrong. We pointed out that ***there is another service, one of their competitors, ClearPlay, the same company that made the DVDs. They offer a service that—they offer a service that works in conjunction with authorized***

---

[20] *Id.*, ¶ 21.
[21] *Id.*, ¶ 22.
[22] *Id.*, ¶ 23.
[23] *Id.*, ¶ 24.
[24] *Id.*, ¶ 25 and Exhibit E thereto.

*streams from Google Play.*[25]

25. In arguing the appeal of the preliminary injunction order to the Ninth Circuit Court of Appeals, the California Plaintiffs' appellate lawyer, Donald Verrilli, affirmed that his clients would not object to a filtering and streaming service that worked in conjunction with an LSS:

> Now, they've said a couple times that our position kills off filtering. That's just not right. . . . There's technology out there, and you have an amicus brief from the company, ClearPlay, that uses the technology, that applies filtering to a licensed stream. It connects up with Amazon or Google, whoever it is who have actually done what they should have done and gotten a license for the public performance rights and paid for it.
> . . .
> But now – but just one more point on the filtering and, you know, whose side we're on here. I think it speaks volumes that the filtering company out there that's trying to do this in a way that's consistent with the copyright laws and the DMCA, ClearPlay, has filed an amicus brief on our side. I think that tells you all you need to know about whether we are trying to kill off filtering or not.[26]

26. Mr. Verrilli also declared that if VidAngel developed "some different system that doesn't violate the DMCA," VidAngel should "talk to the district judge about modifying the injunction. I think that's the proper course here."[27]

27. Since launching its Stream-Based service, VidAngel has been unable to attract and keep enough customers to operate at a break-even level or become cash-flow positive and is instead sliding backwards financially.[28]

28. The most frequent reason given by potential customers who decline to subscribe to VidAngel's service following a free trial is that VidAngel lacks a sufficient amount of content to make subscribing to its service worthwhile.[29]

29. Before the preliminary injunction issued, more than half the motion pictures watched

---

[25] *Id.*, ¶ 16 and Exhibit F thereto (November 14, 2016 Hearing Tr. at 30:7 to 30:14 (emphasis added).
[26]*Id.*, ¶ 27 and Exhibit G thereto.  (Oral Argument Tr. at 28:9-22, at 31:7-15.)

[27] *Id.* and Exhibit G thereto. (Oral Argument Transcript at 25:8-12.)
[28] Declaration of Neal S. Harmon dated July 5, 2018 ("Harmon Decl.), ¶ 6.
[29] *Id.*, ¶ 7.

by VidAngel's customers were ones whose copyrights were owned by the seven current California Plaintiffs, including the Studio Subsidiary Defendants.[30]

30. On April 16, 2018, VidAngel filed a Form 1-K statement with the Securities and Exchange Commission ("SEC") that contained the following overview of VidAngel's financial performance before and after the preliminary injunction issued:

|  | For the Year Ended December 31, | | Change | |
|  | 2017 | 2016 | 2017 vs. 2016 | |
| Revenues | $ 2,718,309 | $ 8,053,867 | $ (5,335,558) | -66% |
| **Operating Expenses:** | | | | |
| Cost of revenues | $ 2,623,229 | $ 2,752,179 | $ (128,950) | -5% |
| Sales and marketing | 1,616,678 | 6,246,739 | (4,630,061) | -74% |
| General and administrative | 2,189,186 | 1,508,878 | 680,308 | 45% |
| Legal | 1,540,929 | 1,273,888 | 267,041 | 21% |
| Research and development | <u>1,499,482</u> | <u>1,093,869</u> | <u>405,613</u> | <u>37%</u> |
| Total Operating Expenses: | $ 9,469,504 | $ 12,875,553 | $ (3,406,049) | |

26% [31]

31. The 1-K also disclosed VidAngel's growing concern with respect to its ability to remain in business:

*Going Concern*

Our financial statements appearing elsewhere in this Form 1K have been prepared on a going concern basis, which contemplates the realization of assets and the settlement of liabilities in the normal course of business. We incurred net losses of $6,722,004 and $4,621,997 for the years ended December 31, 2017 and 2016, respectively. We used net cash of $7,871,872 and $1,415,728 for operating activities in the years ended December 31, 2017 and 2016, respectively. The net losses and use of cash in operating activities resulted from, among other things,

---

[30] *Id.*, ¶ 2.
[31] Quinto Decl., ¶ 28 and Exhibit H thereto at 12.

significant marketing expenditures related to the acquisition of new customers, and significant legal expenses related to the Disney Litigation.

These conditions raise substantial doubt about our ability to continue as a going concern. The financial statements appearing elsewhere in this Form 1K do not include any adjustments related to the recoverability and classification of recorded asset amounts or amounts and classifications of liabilities that might result from this uncertainty.

*Trends and Key Factors Affecting Our Performance*

The issuance of the PI in the Disney Litigation has had, and will continue to have, a material impact on our financial position. We are currently prohibited from streaming movies that are owned by the plaintiffs in the Disney Litigation. These movies compromise over 50% of titles available through our services when the PI took effect. To comply with the PI, we were forced to cease streaming all movies under the old disc-based model.  We are currently prohibited from streaming titles owned by the Plaintiffs on our new Stream-Based Service. We are, however, actively seeking a judicial determination that limits the scope of the preliminary injunction to the activities previously found infringing by the California District Court.[32]

32.   VidAngel has advised the SEC that based on its financial projections made immediately prior to its April 21, 2018 SEC filing, it would run out of cash in July 2018.[33]

33. As of mid-May 2018, VidAngel had less than $500,000 in operating capital left.[34]

34. As reflected in the Copyright Act, 17 U.S.C. § 110(11), it is in the public interest that families be permitted to engage third parties to filter motion pictures to their specifications and stream those filtered motion pictures to them for their private viewing:

Notwithstanding the provisions of section 106 [enumerating the exclusive rights of copyright], the following are not infringements of copyright:

. . .

(11) the making imperceptible, by or at the direction of a member of a private household, of limited portions of audio or video content of a motion picture, during a performance in or transmitted to that household for private home viewing, from an authorized copy of the motion picture, or the creation or provision of a computer program or other technology that enables such making imperceptible and that is designed and marketed to be used, at the direction of a member of a private household, for such making imperceptible, if no fixed copy of the altered version of the motion picture is created by such computer program or other technology.

. . .

---

[32] *Id.*, ¶ 29 and Exhibit H thereto at 15.
[33] *Id.*, ¶ 30.
[34] Harmon Decl., ¶ 8.

Nothing in paragraph (11) shall be construed to imply further rights under section 106 of this title, or to have any effect on defenses or limitations on rights granted under any other section of this title or under any other paragraph of this section.[35]

35.    U.C.L.A. Professor of Law Douglas Lichtman and Dr. Benjamin Nyblade, the Director of the Empirical Research Group of U.C.L.A.'s School of Law spent more than a year analyzing the data kept by VidAngel related to well over 3,000,000 streams to individual customers of almost 3,000 motion pictures during 2016.[36]

36. Professor Lichtman and Doctor Nyblade found that the great majority of VidAngel's customers sincerely wanted to filter motion pictures they watched and that a substantial number of consumers want to watch filtered content.[37]

37. Professor Lichtman and Doctor Nyblade found that approximately 98 percent of VidAngel's customers who used its service 5 or more times used more than the minimum number of required filters.[38]

38. Professor Lichtman and Doctor Nyblade found that VidAngel customers typically filtered less than one percent of the audio content and less than two percent of the video content of the motion pictures they watched.[39]

39. Professor Lichtman and Doctor Nyblade found that consumers who used VidAngel's service to filter motion pictures liked those movies to approximately the same extent as did persons who chose to watch those movies without filtering.[40]

40. Professor Lichtman and Doctor Nyblade found that user-driven filtering does not detract from viewers' movie-watching experience.[41]

---

[35]  *See* 17 U.S.C. § 110(11).
[36] Quinto Decl., and Exhibit L thereto.
[37] *Id.* and Exhibit L thereto at 21.
[38] *Id.* and Exhibit L thereto at 18, fn. 18.
[39] *Id.* and Exhibit L thereto at 31.
[40] *Id.* and Exhibit L thereto at 31.
[41] *Id.* and Exhibit L thereto at 28-30.

41. Professor Lichtman and Doctor Nyblade concluded after an exhaustive study of VidAngel's data that a filtering technology that, as here, serves a market that would otherwise be ignored and that, as with VidAngel's Stream-Based service, does not plausibly impose an economic harm on the movie's copyright owner, is in the public interest and strongly satisfies the elements of copyright fair use.[42]

42. On February 14, 2018, the Studio Subsidiary Defendants each filed claims in VidAngel's Utah Chapter 11 Bankruptcy Case.[43]

<u>Argument</u>

I.    LEGAL AUTHORITY

In an action for declaratory relief, a court may preliminarily enjoin enforcement of a statute or order being contested. [44]

A plaintiff seeking a preliminary injunction must establish "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.[45]

---

[42] Quinto Decl., and Exhibit L thereto at 33-35.

[43] *Id.*, ¶ 31 and Exhibits I-K thereto.

[44] *See Doran v. Salem Inn, Inc.*, 422 U.S. 922 (1975) (affirming that district court did not abuse its discretion in preliminarily enjoining enforcement of an ordinance in an action seeking a declaration that the ordinance was unconstitutional); *United Artists Corp. v. Gladwell*, 373 F. Supp. 247 (N.D. Ohio 1974) (in an action for declaratory judgment as to the applicability of certain sections of a state code and as to their constitutionality, court preliminarily enjoined county sheriff from filing criminal charges against a motion picture distributor because, "the plaintiff has already suffered, and will continue increasingly to suffer, measurable pecuniary loss as the result of delay in exhibiting the motion picture" and it was "difficult to see what harm would be done to the defendant by being restrained from abusing his powers, while the harm to the plaintiff from further delay is substantial and increasing"); *CCCO-W. Region v. Fellows*, 359 F. Supp. 644 (N.D. Cal. 1972) (in action for a declaration that order prohibiting the plaintiffs from distributing publications on a military base, court preliminarily enjoined military from enforcing statute denying access to a military base in contravention of the commander's order); *Sortex Co. of N. Am. v. Mandrel Indus., Inc*., 226 F. Supp. 995 (W.D. Mich. 1964) (enjoining prosecution of a patent infringement claim in another court pending the outcome of case seeking declaration of patent invalidity); *Johnson v. Dist. Ct. of the Seventeenth Judicial Dist*., 195 Colo. 169 (Colo. S. Ct. 1978) (en banc) (under appropriate circumstances a court may issue a preliminary injunction in connection with a declaratory judgment action, as when the defendant's actions, unless restrained, would prevent the plaintiff from conducting its business and would cause immediate and irreparable injury to the plaintiff and its employees); *Paer v. Guhl*, 236 Ga. 768 (Ga. S. Ct. 1976) (failure to grant temporary injunction to maintain status quo pending trial of declaratory judgment action was an abuse of discretion); *Burlingame v. Milone*, 62 Misc. 2d 853, 310 N.Y.S.2d 407 (N.Y. S. Ct., Nassau Cty., 1970) (preliminary injunction allowing the plaintiff to wear a beard issued in an action seeking a declaration that regulation prohibiting beards was invalid).

Ultimately, the "decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts, and . . . such discretion must be exercised consistent with traditional principles of equity . . . .".[46]

In determining whether to grant or deny a motion for preliminary injunction, the most important element is whether the moving party will suffer irreparable harm.[47]

## II.   VIDANGEL IS LIKELY TO SUFFER IRREPARABLE HARM ABSENT A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION.

It is well recognized that a threat to the viability of a business may constitute irreparable harm.[48]

As reflected in VidAngel's 1K SEC filing and the Harmon Declaration, VidAngel is now in imminent danger of having to cease business operations and could be forced to convert its Chapter 11 bankruptcy filing into a Chapter 7 proceeding if it cannot quickly increase its subscriber base.  Because the principal reason customers who have tried VidAngel's Stream-Based service but declined to subscribe give for the decision is VidAngel's lack of sufficient content, VidAngel must offer more content to avoid irreparable injury.

## III.   VIDANGEL IS LIKELY TO SUCCEED ON THE MERITS OF ITS ACTION

### A.   VidAngel's Stream-Based Method Is Protected by the Safe Harbor Provision of the Family Movie Act.

The Family Movie Act ("FMA') enumerates two types of conduct as non-infringing of copyright.  First is the filtering itself: "the making imperceptible . . . at the direction of a member

---

[45] *Winter v. Natural Resources Defense Council*, 129 S. Ct. 365, 374 (2008); eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006); *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004).

[46] *eBay Inc.*, 547 U.S. at 394

[47] *See Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004); see also *Hill's Pet Nutrition, Inc. v. Nutro Prods., Inc.*, 258 F. Supp. 2d 1197, 1205 (D. Kan. 2003).

[48] *Tri-State Generation and Transmission Ass'n v. Shoshone River Power, Inc.*, 805 F.2d 351, 356 (10th Cir. 1986) (citing *Roso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co.*, 749 F.2d 124, 125–26 (2d Cir.1984) (damages cannot fully compensate husband and wife for loss of years of effort and livelihood); *John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc.*, 588 F.2d 24, 28–29 (2d Cir.1978) (possibility of going out of business is irreparable harm), cert. denied, 440 U.S. 960, 99 S. Ct. 1502, 59 L. Ed. 2d 773 (1979); *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir.1970) (loss of right to continue business may support claim of irreparable injury)).

of a private household, of limited portions of audio or video content of a motion picture, during a performance . . . transmitted to that household for private home viewing . . . from an authorized copy of the motion picture." [49] The requirement that the transmission be from an authorized copy was included to prevent illegal file-sharing services from gaining the protection of the FMA by filtering pirated files.[50]

Second is "the provision of a computer program or technology that enables such making imperceptible and that is designed and marketed to be used, at the direction of a member of a private household" provided that technology does not create "[a] fixed copy of the altered version of the motion picture." [51]   Compliance with either of the above conditions is, by command of Congress, non-infringing.

Further, the concluding sentence of section 110(11) provides, in part, that "[n]othing in paragraph (11) shall be construed to imply further rights under section 106 of this title." [52] Accordingly, section 110(11) does not expand or increase any rights copyright owners are afforded under the Copyright Act.[53]   Moreover, it provides that nothing in paragraph (11) shall be construed "to have any effect on defenses or limitations on rights granted under any other section of this title or under any other paragraph of this section." [54] Thus, because only copyright defendants benefit from defenses and limitations on rights, the FMA has no effect on the right to assert fair use as a defense. [55]

VidAngel's Stream-Based service satisfies each of the conditions set forth in the FMA.

---

[49] *Id.*
[50] *See* 17 U.S.C. 110(11); Dkt. 80 (RJN, Ex. B, 150 CONG. REC. H7654-01 (Sept. 28, 2004) ("The making imperceptible must be 'from an authorized copy of a motion picture.'  Thus, skipping and muting from an unauthorized to 'bootleg' copy of a motion picture would not be exempt.").)
[51] *See* 17 U.S.C. 110(11).
[52] *Id*.
[53] *See id.*
[54] *Id.*
[55] *See id.*

To use it, customers must first purchase streamed content from their preferred LSS. [56]  Although VidAngel makes copies, they are merely a necessary intermediate step in the technology. [57] Temporary "working" copies allow VidAngel to create "tags" that permit viewers to filter a work to meet their values.[58]  Permanent Cloud-based copies are necessary to ensure that each customer receives a smooth transmission of the content he or she purchased from an LSS, and to ensure that the user can watch the content on modern mobile and TV devices. [59]  Without these intermediate copies, customers would be prevented from watching filtered content on all modern mobile and TV devices, including smartphones, tablets, smart TVs and OTT devices. [60]

The Studio Subsidiary Defendants' argument that VidAngel does not stream "from authorized copies" is wrong.  The "authorized copy" requirement was included in the FMA to prevent filtering from bootleg copies, not to prevent filtering of lawfully purchased streams. [61] ("The making imperceptible must be 'from an authorized copy of a motion picture.' Thus, skipping and muting from an unauthorized or 'bootleg' copy of a motion picture would not be exempt.").  VidAngel creates every filtered stream as it receives a stream from an LSS that a customer lawfully purchased.[62]  As such, VidAngel's technology "make[s] imperceptible" *from* an authorized copy.  Accordingly, the FMA prohibits the making of a "fixed copy of *the altered version* of the motion picture" but does not prohibit the making of a copy of the unaltered version. [63] If Congress meant to prohibit necessary, intermediate copying, it would have prohibited the making of "*any* copy of the motion picture."  And, even if that were not the case,

---

[56] Dkt. 78 (Declaration of Jarom McDonald ("McDonald Decl.") ¶ 2.)
[57] *Id.* ¶¶ 3, 6.
[58] *Id.* ¶ 3.
[59] *Id.* ¶¶ 3, 6.
[60] *Id.* ¶ 6.
[61] *See* Dkt. 80 (RJN, Ex. D, 151 Cong. Rec. S501 (daily ed. Jan. 25, 2005).)
[62] Dkt. 78 (McDonald Decl., ¶ 4.)
[63] 17 U.S.C. § 110(11).

VidAngel's intermediate copies would be a fair use. [64]

B. <u>The Legislative History Confirms That Congress Intended the FMA to Ensure That Families Would Have the Right to Control the Content That Enters Their Homes</u>

When Congress enacted the FMA, it determined that the right of parents to control content in their own homes in accord with their constitutionally-protected values outweighs the moral and artistic rights of studios and directors.  The FMA was intended to ensure "that existing copyright and trademark law cannot be used to prevent a parent from deciding what their children see in the privacy of their own home." [65]  Congress sought to "shield[] companies that make movie-filtering systems from liability for copyrighting infringement," [66] and to "ensure" technology that helps parents "determine what their children see on the screen" would "not face continued legal challenges." [67]

Congress believed strongly that families should be allowed to filter content shown at home.   The FMA's House sponsor succinctly explained that need:

> Just as the author of a book should not be able to force someone to read that book in any particular manner or order, a studio or director should not be able to force our children to watch a movie in a particular way.  No one can argue with a straight face it should be against the law to skip over a few pages or even entire chapters of a book.  So, too, it should not be illegal to skip over a few words or scenes in a movie.  The Family Movie Act ensures that parents have such rights. [68]

The House Report (as well as the text of the statute itself) explained the conditions necessary to satisfy the FMA: "This new subsection *ensures* that U.S. copyright law does not prohibit . . . the use of *any filtering service or technolog*y that mutes or skips content, provided the service or technology:  1. 'is confined to private, in-home use; 2. 'for the household of the

---

[64] *See infra* at Section II.
[65] Dkt. 80 (RJN, Ex. B, 150 Cong. Rec. H7654-01 (Sept. 24, 2004) (statement of Rep. Sensenbrenner).)
[66] *Id.*
[67] *Id*. (statement of Rep. Smith).
[68] Dkt. 80 (RJN, Ex. G, 150 CONG. REC. H2114-01 (April 19, 2005) (statement of Rep. Lamar Smith).)

purchasing consumer only; and 3. 'does not create a fixed copy of the alternate version." [69] Further, "*technology* used to filter certain material out of movies for private viewing would not constitute a violation of copyright or trademark law." [70]  The Report explained what was *not* exempted: "The Act does not create an exemption for actions that result in fixed copies of altered works." [71]  In other words, studios have the right to exclusively distribute their motion pictures, but viewers also have the right to mute or skip parts they do not want to hear or see.

Because VidAngel has eliminated all the California Plaintiffs' (including the Studio Subsidiary Defendants') purported economic harms and has eliminated decryption, it is likely to succeed on the merits of its claim based on its compliance with the FMA.

C.   VidAngel's Stream-Based Service Is Also a Fair Use.

The fair use doctrine permits otherwise infringing uses that society chooses to allow.  It is an "equitable rule of reason . . . which permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster." [72]  To determine whether the use made of a work in any particular case is a fair use, the following non-exclusive factors are considered: (1) the purpose and character of the use; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work. [73]  "The task is not to be simplified with bright-line rules, for the statute, like the doctrine it recognizes, calls for case-by-case analysis." [74]  The factors are discussed below in order of legal importance, starting with the fourth, most crucial factor, market effect.

---

[69] Dkt. 80 (RJN, Ex. F, H.R. REP. No. 109-33(I) at 24 (emphasis added).)
[70] *Id*. at 21 (emphasis added).
[71] *Id*. at 7.
[72] *Stewart v. Abend*, 495 U.S. 207, 236 (1990).
[73] *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 576–77 (1994).
[74] *Id.* at 577.

1.  Market Effect

The "single most important element of fair use" is the fourth factor. [75]  It requires this Court to assess the impact of the use on the traditional market for the copyrighted work. [76] To defeat a claim of fair use, the copyright holder must point to market harm that results because the secondary use serves as a substitute for the original work. [77]  This factor "requires the Court to strike a balance 'between the benefit the public will derive if the use is permitted and the personal gain the copyright owner will receive if the use is denied." [78] In other words, is the copying likely to usurp the market for the original work? [79]

Even complete copying that has no market effect has been deemed fair use.  For example, in one seminal case, unauthorized time shifting was approved largely because copyright owners "failed to demonstrate that [it] would cause any likelihood of nonminimal harm to the potential market for, or the value of, their copyrighted works." [80]

The court in the California Litigation weighed the market effect factor in the California Plaintiffs' favor, finding that VidAngel's business was likely to satisfy demand for the original. The Stream-Based service dramatically reverses the weight of this factor in favor of fair use.  No VidAngel customer can now view a filtered version of a work that he or she has not already purchased from an LSS.  Defendants thus are paid in full, in a manner and amount they have approved, for every work that VidAngel filters.

The only effect on the market is *positive*. Roughly 51% of VidAngel customers would

---

[75] *Harper & Row v. National Enterprises*, 471 U.S. 539, 566 (1985).
[76] *Id.*
[77]  *See Campbell*, 510 U.S. at 591; see also NXIVM Corp. v. Ross Inst., 364 F.3d 471, 481–82 (2d Cir. 2004) ("cognizable market harm" is limited to "market substitution").
[78] *Columbia Pictures Indus., Inc. v. Miramax Films Corp.*, 11 F. Supp. 2d 1179, 1189 (C.D. Cal. 1998) (quoting *MCA, Inc. v. Wilson*, 677 F.2d 180, 183 (2d Cir. 1981).
[79] *See Blanch v. Koons*, 467 F.3d 244, 258 (2d Cir. 2006); NXIVM, 364 F.3d at 481-82.
[80] *Sony Corp. of Am.*, 464 U.S. at 456.

not watch the films offered by VidAngel without filtering.[81]   What this means is that for every

100 people who use VidAngel's Stream-Based Service, 51 of them are paying defendants *full*

*price* for a licensed streaming copy they never would otherwise have bought.

      2.  <u>Purpose and Character of the Use</u>

      Apart from market effect, the central purpose of the fair use inquiry is to determine

whether and to what extent the new work is "transformative."[82] A work is "transformative"

when the new work does not "merely supersede the objects of the original creation" but "adds

something new, with a further purpose or different character, altering the first with new

expression, meaning, or message."[83]

      A work may be transformative in at least two ways.  First, "[a]n allegedly infringing

work is typically viewed as transformative so long as new expressive content or message is

apparent.  This is so even where – as here – the allegedly infringing work makes few physical

changes to the original or fails to comment on the original."[84] "For example, a parody

transforms a work by appropriating elements of the work for purposes of comment or criticism,

and thus reflects transformative value because it can provide a social benefit, by shedding light

on an earlier work, and in the process, creating a new one."[85] In fair use, tragedy becomes

comedy.

      Second, a use "can be transformative in function or purpose without altering or actually

adding to the original work."[86]  Even *verbatim* copying "may be transformative so long as the

---

[81] Dkt. 79 (Declaration of Elizabeth Ellis ("Ellis Decl."), ¶¶ 3-4.)
[82] *Campbell*, 510 U.S. at 579.
[83] *Id.*
[84] *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1177-78 (9th Cir. 2013)
[85] *Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1262 (11th Cir. 2014) (internal quotations omitted).
[86] *A.V. ex rel. Vanderhye v. iParadigms*, LLC, 562 F.3d 630, 639 (4th Cir. 2009) (holding that making an exact digital copy of a student's thesis for the purpose of determining whether it included plagiarism is a fair use).

copy serves a different function than the original work."[87]

VidAngel's Stream-Based service satisfies both tests.  VidAngel users experience a version of the motion picture different from the original and therefore imbued with different expressive content.  VidAngel's service is also transformative in function or purpose because it enables individual viewers and families to exercise editorial control over the content they watch in the privacy of their own homes.  Instead of being a passive consumer of motion pictures, VidAngel's Stream-Based Service empowers viewers with a user friendly and effective tool to select thousands of combinations of filters to modify the presentation of a motion picture according to their own individual preferences. [88]

To state the obvious: omissions can transform a work. Romeo and Juliet absent the final act is not a tragedy, and the Bible would read quite differently without the resurrection of Jesus. Those choices matter *because* omissions can transform a work.  In the same way, removal of mature content from movies has such a powerfully transformative effect that only then will certain audiences watch those movies. Religious convictions, and parental views about what is appropriate for children, are real and powerful and matter more to VidAngel's customers than *anything else* about a particular title.

But one need not take VidAngel's and its customers words for it – directors and studios agree that omissions matter.  This was a key premise of their opposition to the FMA.  They so fiercely opposed filtering *because* omissions transform works in ways they find artistically unacceptable.  A G-rated version of their R-rated movie was *very* different to them.  But their lament was no different under the law than the complaint of the author whose work has been

---

[87] *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1165 (9th Cir. 2007) (holding that a search engine's publication of thumbnail copies of copyrighted images was "highly transformative" because the thumbnails were "incorporated into a new work, namely, an electronic reference tool").

[88] See Author's Guild v. Google, Inc., 804 F.3d 202, 216-17 (2d Cir. 2015) (holding that Google's digital books library with a search function is "highly transformative" because it enables the public to run text word searches to locate specific words or terms from books, a function that did not previously exist).

parodied and who objects to others making fun of her. [89]  Congress ultimately agreed that omissions mattered, determining that simply omitting portions of copyrighted works that viewers find objectionable was significant enough to warrant express protection under the FMA.

Other courts agree that editing expressive content from a work can be transformative and have held that to argue otherwise is "clearly misguided." [90]  "The use of a copyrighted work need not alter or augment the work to be transformative in nature.  Rather, it can be transformative in function or purpose without altering or actually adding to the original work." [91]

### 3. Nature of the Copyrighted Work

The next factor in the fair use analysis is the "nature of the copyrighted work."  VidAngel acknowledges that motion pictures are within "the core of copyright protection." [92]  However, because defendants' movies are published and released for streaming before any VidAngel user is able to view a filtered version, this factor would at most weigh slightly against VidAngel.

The right of first publication is "the author's right to control the first public appearance of his expression." [93]  Because this right encompasses "the choices of when, where, and in what form first to publish a work," [94] an author exercises and exhausts this one-time right by publishing the work in any medium. [95]  For example, in *Perfect 10*, 416 F. Supp. 2d at 849–50, the court correctly held that once Perfect 10 had exploited the commercially valuable right of first publication by putting its images on the Internet for paid subscribers, it was no longer

---

[89] *See Leibovitz v. Paramount Pictures Corp.*, 137 F.3d 109, (2d Cir. 1998) (on the basis of fair use, court rejected famed photographer Annie Leibovitz's argument that her iconic cover photograph of a nude, pregnant Demi Moore had been infringed when it was altered to superimpose actor Leslie Nielsen's head in an advertising poster for the slap-stick comedy Naked Gun 33 1/3).

[90] *A.V. ex rel. Vanderhye*, 562 F.3d at 639.

[91] *Id.*; see also Perfect 10, 508 F.3d at 1165-66 (holding that a search engine is transformative because it provides a previously unavailable tool to the public).

[92] *See Elvis Presley Enters. v. Passport Video*, 349 F.3d 622, 629 (9th Cir. 2003).

[93] *Harper & Row*, 471 U.S. at 564, 105 S. Ct. 2218.

[94] *Id.*

[95] *See, e.g., Batjac Prods. Inc. v. GoodTimes Home Video Corp.*, 160 F.3d 1223, 1235 (9th Cir.1998) (noting, in the context of the common law right of first publication, that such right "does not entail multiple first publication rights in every available medium").

entitled to the enhanced protection available for an unpublished work. Accordingly, the court held that this factor weighed only slightly in favor of Perfect 10. [96] Most importantly, defendants' motion pictures are not only *ubiquitously available* in the licensed streaming market, but any viewer that filters it has already purchased a licensed copy of it. This factor has little effect (if any) on the fair use determination.

        4.   <u>Amount and Substantiality of Copying</u>

The Copyright Act directs courts deciding whether a particular use is fair to consider "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." [97] This factor asks whether the secondary use employs more of the copyrighted work than is necessary, and whether the copying was excessive in relation to any valid purposes asserted under the first factor.

Courts have rejected any categorical rule that copying of the entirety cannot be a fair use. It would be illogical in the extreme to argue that although Congress authorized filtering of *entire* motion pictures, the technology used to provide that service could be used only with respect to a portion of a motion picture. Unsurprisingly, completely unchanged copying has repeatedly been found to be a fair use when it was reasonably appropriate to achieve the copier's transformative purpose and did not offer a competing substitute for the original. [98] What matters is not "the amount and substantiality of the portion used" *in making a copy,* but rather the amount and substantiality of *what is thereby made accessible* to a public for which it may serve as a competing substitute. [99]

Here, the amount of copying done by VidAngel is the minimum necessary to provide viewers with their desired filtered content. The only purpose of VidAngel's limited copying is to

---

[96] *See Perfect 10*, 508 F.3d 1146.
[97] 17 U.S.C. § 107(3).
[98] *Authors Guild v. Google, Inc.*, 804 F.3d 202, 221 (2d Cir. 2015).
[99] *Id.* at 221-222.

enable consumers to enjoy the benefits conferred by the FMA.  Because VidAngel's purpose serves the public interest, the amount of copying is not excessive in relation to this Congressionally-recognized aim.

Indeed, even when an alleged infringer has copied an entire original work, this factor does not weigh in favor of either party if such copying was reasonable in light of the purpose served.  For example, in *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 821 (9th Cir. 2002), the Ninth Circuit determined that the creation of complete copies of protected works by Arriba "was necessary to allow users to recognize the image and decide whether to pursue more information about the image or the originating [website].  If Arriba only copied part of the image, it would be more difficult to identify it, thereby reducing the usefulness of the search engine."[100] Because VidAngel's copying is the minimum necessary to allow consumers to enjoy filtered content, this factor favors a finding of fair use.

Thus, on balance the four fair use factors strongly favor a finding that VidAngel's Stream-Based service is fair use.

## IV.    THE BALANCE OF HARM WEIGHS IN FAVOR OF VIDANGEL

Courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."[101]

No more lopsided balance of harm than is presented by VidAngel's motion can be imagined.  If relief is denied, VidAngel faces likely extinction.  If relief is granted, the Studio Subsidiary Defendants will suffer no harm.

## V.     THE PUBLIC INTEREST, AS EXPRESSED BY CONGRESS, FAVORS

VIDANGEL'S REQUEST

---

[100] *See also Perfect 10*, 508 F.3d at 1167-68 (same).

[101] *Winter v. Natural Resources Def. Council, Inc.*, 129 S. Ct 365, 376-77 (2008) (citing *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542 (1987).

In 2005, the FMA was approved without any dissenting vote by both the United States Senate and the United States House of Representatives.  It was then signed by President George W. Bush and took effect the same day.  VidAngel was founded and exists to allow families to benefit from the rights conferred on them by the passage of the FMA.  That VidAngel's service is in the public interest is inarguable.

VI.     NO BOND SHOULD BE REQUIRED

Although Federal Rule of Civil Procedure 65(c) ordinarily requires the posting of a bond when a preliminary injunction issues, the Court has "wide discretion under Rule 65(c) in determining whether to require security," and the Tenth Circuit has upheld a district court's decision not to require a bond when there was an "absence of proof showing a likelihood of harm." [102] Because the Studio Subsidiary Defendants face no risk of economic harm and VidAngel is desperately trying to conserve its resources, no bond should be required.

VII.    VIDANGEL RESPECTFULLY REQUESTS EXPEDIENCY

To ensure that its ultimate determination of the parties' rights is beneficial to the parties and not a pyrrhic victory for one after the filtering of streamed motion picture content has come to an end, VidAngel respectfully requests that the Court decide its motion expeditiously.

Conclusion

For all the foregoing reasons, Plaintiff respectfully requests that the Court enter an order temporarily restraining the Studio Subsidiary Defendants from seeking to hold Plaintiff in contempt if Plaintiff offers the Studio Subsidiary Defendants' content to customers using its Stream-Based method pending the Court's hearing and ruling on Plaintiff's motion for preliminary injunction.

---

[102] *Winnebago Tribe of Neb. v. Stovall*, 341 F.3d 1202, 1206 (10th Cir. 2003).

DATED: July  5, 2018

By: _____

David W. Quinto
VIDANGEL, Inc.

*Attorneys for Plaintiff VidAngel, Inc.*